**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| Lauren Vaughn<br><br>     Plaintiff,<br><br>vs.<br><br>Spartanburg County School District Five, the Board of Trustees of Spartanburg County School District Five, and Superintendent Randall R. Gary, in his individual and official capacities,<br><br>     Defendants. | C/A No.: 7:25-cv-12623-DCC<br><br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |

  Plaintiff Lauren Vaughn, through undersigned counsel, respectfully moves this Court for a preliminary injunction reinstating her to her position with Spartanburg County School District Five ("Defendant District") and enjoining Defendants from enforcing or relying upon the District's Social Media Guidelines pending final judgment.

## **INTRODUCTION**

  Ms. Vaughn, a respected and award-winning teacher assistant at River Ridge Elementary School, was terminated on September 15, 2025, solely because of a private, off-duty Facebook post expressing compassion and political opinion regarding Second Amendment policy. (ECF No. 1, Compl. ¶¶ 11-19). Her termination, based on Defendant District's Social Media Guidelines, violates not only the First and Fourteenth Amendments but also Article I, § 2 of the South Carolina Constitution and South Carolina's public-policy prohibition on discharge for political opinions, as codified in S.C. Code Ann. § 16-17-560 and recognized in *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219 (1985).

This motion seeks narrowly tailored relief: reinstatement with pay pending final resolution and suspension of Defendant District's unconstitutional Social Media Guidelines. Such relief is necessary to preserve the status quo, prevent ongoing constitutional and statutory injury, and serve the public interest in safeguarding both free expression and South Carolina's policy against political retaliation in employment.

**FACTUAL BACKGROUND**

Ms. Vaughn began employment with Spartanburg County School District Five as a Teacher Assistant at River Ridge Elementary School and served for approximately six years with distinction. (Ex. 1 – Vaughn Aff.). Defendant District consistently rated her performance as outstanding and recognized her as Support Staff Employee of the Year in 2021, an honor publicly announced by River Ridge Elementary School as "the pride of River Ridge." (*Id.*; Ex. 2 – Support Staff of the Year Post).

On September 10, 2025, outside working hours and from her personal account, following the death of Charlie Kirk due to gun violence, Ms. Vaughn posted the following quotation attributed to him:

> "I think it's worth to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment to protect our other God-given Rights. That is a prudent deal. It is rational." – Charlie Kirk. (Ex. 3 – Gun Violence Post and Comments).

To this quote, she added "Thoughts and prayers."

In subsequent discussion in comments to the same post, Ms. Vaughn clarified her meaning: she disagreed with Kirk's statement, expressed heartbreak for all victims of gun violence, and called for collective action to make schools and communities safer. (*Id.*) Her

comments were limited to her private Facebook friends list and did not reference District Five, River Ridge Elementary, or any employee or student. (Ex. 1).

Despite deleting the post that same evening, on September 12, Defendant District placed her on administrative leave and, three days later, terminated her employment. The termination letter cited her post, as well as the Social Media Guidelines, which require employees to "always represent the District in the best light" and to "be respectful and professional in all communications (by word, image, or other means)." (Ex. 4 – Term. Letter and Ex. 5 – Social Media Policy).

The Defendants never presented evidence of significant disruption of school operations to Ms. Vaughn. In their Answer, they do not allege any specific facts to support their claim of disruption. (ECF No. 8). Indeed, there was no disruption.

Superintendent Randall R. Gary's termination letter constituted the final decision regarding Ms. Vaughn's termination, and there was no further grievance or appeal process available to her. Ms. Vaughn has suffered loss of income and benefits, reputational harm, and emotional distress as a result. (Ex. 1).

## **LEGAL STANDARD**

A preliminary injunction is an extraordinary remedy but one appropriate to prevent ongoing violation of constitutional rights. *See Keyes v. School Dist.*, 396 U.S. 1215 (1969) ("Where a preliminary injunction has issued to vindicate constitutional rights, the presumption in favor of the District Court's action applies with particular force."). A plaintiff seeking a preliminary injunction must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) the balance of equities favors the plaintiff;

and (4) the injunction serves the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Each factor strongly favors Ms. Vaughn.

## ARGUMENT

**I. Plaintiff is likely to succeed on the merits regarding both Defendant District's Social Media Guidelines and Defendant District's application of the Social Media Guidelines in terminating Plaintiff.**

Ms. Vaughn challenges both Defendants' Social Media Guidelines for their unconstitutional overbreadth as well as Defendants' termination of Ms. Vaughn under the same Social Media Guidelines. Due to the chilling nature of the Social Media Guidelines' overbreadth, Plaintiff is likely to succeed on both.

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Public employees may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *Garcetti v. Ceballos*, 547 U.S. 410 (2006) ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.").

While there are limitations in the freedom of employees who accept public employment, where a public employee speaks out on a matter of public concern, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Consequently, "[v]igilance is necessary to ensure that public employers do not use

authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987).

Here, Defendants' Social Media Guidelines are facially unconstitutional because they present an impermissible ex ante restraint on protected speech, and Defendants' termination of Ms. Vaughn is an impermissible violation of her right to speak out on a matter of public concern not outweighed by Defendants' interests in maintaining an efficient workplace.

> **a. Plaintiff is likely to succeed on the merits on her challenge to Defendants' ex ante restraint on speech through the Social Media Guidelines, as they are constitutionally overbroad.**

In evaluating the constitutionality of a generally applicable social media policy limiting public employee speech, the Fourth Circuit applies the standard set forth in *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454 (1995). *Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016). The government's burden is greater where a policy "impede[s] a 'broad category of expression' and 'chills potential speech before it happens.'" *Id.* at 407 (quoting *NTEU*, 513 U.S. at 467, 468).

In this context, a threshold matter is to evaluate whether the policy regulates public employees' rights to speak on matters of public concern. *Liverman*, 844 F.3d at 407. If the answer is yes, then the "Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). The Government must also show that "the recited harms are real, not merely

5

conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 468.

Courts throughout the country have prohibited similar "positive image" social media policies. *See, e.g., Liverman*, 844 F.3d 400. In *Liverman*, the Fourth Circuit held that the City of Petersburg's social media policy prohibiting "the dissemination of any information 'that would tend to discredit or reflect unfavorably upon the [Department] or any other City of Petersburg Department or its employees'" was an unconstitutionally broad ex ante restraint on employee speech. *Liverman*, 844 F.3d at 407-08. There, the court found that the policy regulated officer's rights to speak on matters of public concern, as "the restraint [wa]s a virtual blanket prohibition on all speech critical of the government employer." *Id.* at 407. Additionally, the court remarked upon the "astonishing overbreadth" of the policy that prohibited "just about anything." *Id.* at 408. The court observed that while social media has the "capacity . . . to amplify expressions of rancor and vitriol, with all its potential disruption of workplace relationships," it also has emerged as a "hub for sharing information and opinions with one's larger community." *Id.* Consequently, social media is a vital tool for citizens speaking on matters of public concern.

Furthermore, while the court acknowledged that the defendant police department had legitimate interests in preventing "divisive social media use" from disturbing camaraderie among officers and the community, the Department failed to establish any "real, not merely conjectural harms" throughout its "generalized allegations of budding 'divisiveness,'" including the fact that some employees requested shift transfers away from plaintiffs. *Id.* The court held the policy to be an impermissible prior restraint,

explaining that the "speculative ills" targeted by the policy did not "justify such sweeping restrictions" on officers' speech. *Id.* at 408-09.

Here, Ms. Vaughn can establish that Defendants' policy regulates employee speech on a matter of public concern, because identical to *Liverman*, it prohibits any expression critical of the Defendant District. Just as the *Liverman* policy prohibited social media expression "that would tend to discredit or reflect unfavorably upon the" government, so too does Defendants' policy insist that—even in their private, off-duty posting—employees speak only positively about Defendant District, insisting that '[e]mployees must be respectful in all communicates (by word, image, or other means)," and prohibiting complaints about one's job or the work environment. (Ex. 5). This policy therefore drastically limits the manner in which an employee can speak on matters of public concern, both with respect to Defendant District *and* matters entirely unrelated to an employee's job duties to the extent that the District perceives the speech as "disrespectful" or negatively reflecting on the District.[1] Therefore, because the Social Media Guidelines regulate Defendants' employees' rights to speak on matters of public concern, Ms. Vaughn is likely to succeed in establishing that the Social Media Guidelines regulate protected speech.

Additionally, Ms. Vaughn can also establish that the Social Media Guidelines are an impermissibly overbroad restriction on protected speech. Just as the *Liverman* policy sought to eliminate *any* potential divisiveness even in the absence of material disruption,

---

[1] In the instant matter, Defendants have relied on the Social Media Guidelines to regulate speech that does not even *mention* the District, much less Plaintiff's position as an educator. (Ex. 5). In fact, the discussion only mentions "school" in passing to state that "we all want the same thing—for everyone to be safe in their school, home, church, in a public place, at a rally or event, or just out in public." (Ex. 5).

7

so too do Defendants' Social Media Guidelines. While Defendants have a legitimate interest in ensuring that off-duty divisive speech does not go so far as to impair the efficiency of the workplace, they have not and are not likely to meet their elevated burden to establish that the Social Media Guidelines address an *actual* disruption to Defendants' mission beyond conjectural harms and speculation of divisiveness. The overbreadth of Defendants' Social Media Guidelines is, like in *Liverman*, "astonishing." Defendants' insistence that *all* online employee communications reflect the District in the "best light," that they be "respectful," and that they be "professional" are overbroad, content and viewpoint-based restrictions on speech that limits employees' rights to speak critically about matters even unrelated to their position with Defendants. Therefore, Defendants are unlikely to be able to establish that the Social Media Guidelines are justified to address actual, material disruption. Ms. Vaughn is likely to succeed in establishing that the Social Media Guidelines are unconstitutionally overbroad.

Because Ms. Vaughn can establish that the Social Media Guidelines regulate employees' rights to speak on matters of public concern and are unjustifiably overbroad beyond any legitimate need of Defendants to address material disruption to efficient operations, she is likely to succeed on the merits of her challenge to Defendants' *ex ante* restraint on employee speech.

> **b. Plaintiff is likely to succeed on the merits of her challenge to Defendant District's *ex post* disciplinary action, because her interests in speaking out as a private citizen on a matter of public concern outweigh any generalized and unsubstantiated interests of disruption alleged by Defendants.**

Ms. Vaughn is also likely to succeed on the merits of her as-applied challenge to Defendants' *ex post* disciplinary action, as she can establish that she spoke as a citizen

8

on a matter of public concern—Second Amendment policy—and her First Amendment right to express criticism of the present state of gun policies outweighs Defendants' interest in the efficient operation of the workplace.

To establish a First Amendment challenge to an adverse employment action, an employee must establish (1) that she spoke as a citizen on a matter of public concern; (2) that her interest in First Amendment expression outweighs the employer's interest in the efficient operation of the workplace; and (3) that the protected speech was a substantial factor in the employer's decision to take the adverse employment action. *Liverman*, 844 F.3d at 409 (quoting *McVey v. Stacy*, 157 F.3d 271, 277-78).

First, Ms. Vaughn can establish that she spoke on a matter of public concern, because the matter of Second Amendment gun policy is categorically a public issue and occupies the "highest rung" of First Amendment values. *See Connick*, 461 U.S. at 145. The Supreme Court "has frequently reaffirmed that speech on public issues occupies the 'highest rung of hierarchy of First Amendment values,' and is entitled to special protection." *Id.* (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) and *Carey v. Brown*, 447 U.S. 455, 467 (1980)). Speech is a matter of public concern "if it affects the social, political, or general well-being of a community." *Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999) (citing *Connick*, 461 U.S. at 146). By contrast, employee speech is *not* a matter of public concern protected by the First Amendment where the speech involves personal grievances or "matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (citing *Connick*, 461 U.S. 138, 247). The inquiry rests on "whether the public or community is likely to be truly

concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee." *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985) (internal quotation marks omitted). The court must examine the content, context, and form of the employee's speech in light of the record. *Edwards*, 178 F.3d at 247 (citing *Connick*, 461 U.S. at 147-48).

In *Edwards v. City of Goldsboro*, the Fourth Circuit held that an off-duty police officer's off-duty speech regarding "the proper use and manner of carrying a concealed handgun in North Carolina" was a matter of public concern, as the speech was "of obvious concern to citizens on both sides of the often hotly debated issues surrounding the right of ordinary citizens to carry a concealed handgun." *Edwards*, 178 F.3d at 247. The Fourth Circuit further explained that the context of the officer's speech—instruction in a public handgun course—weighed "heavily" in favor of finding his speech was a matter of public concern. *Id.*

By contrast, in *Stroman*, the Fourth Circuit found that a school district employee's letter that primarily concerned self-interested grievances arising out of his role as school district employee was not speech on a matter of public concern. *Stroman*, 981 F.2d at 159. There, the teacher's speech directly addressed his complaints about his school district's sick leave policy, and he addressed these complaints internally to his co-workers. *Id.* at 154.

Here, just as in *Goldsboro*, Ms. Vaughn has spoken about the "hotly debated issues" regarding this nation's interpretations of and policies related to the Second Amendment right to bear arms, including a critique of commentary that Charlie Kirk brought into the public eye. Also, just like the officer in *Goldsboro*, Ms. Vaughn spoke in

10

an off-duty public forum for the express purpose of sharing her opinion in a context where she could engage in a discussion in which the public would have an interest.

Moreover, Ms. Vaughn's speech stands in stark contrast to that of the teacher in *Stroman*. There, the educator's audience included fellow members of the school district, and his letter addressed his specific role as a teacher in Colleton County School District. By contrast, Ms. Vaughn directed her Facebook post at her immediate community and did not mention a single detail about her role as a teacher. Ms. Vaughn addressed the tragedy of continued gun deaths in the United States and the need for substantive change in gun policy in the community, in general.

In sum, Ms. Vaughn's commentary reflected empathy and civic engagement, not personal grievance. In *Rankin v. McPherson*, 483 U.S. 378 (1987), even a hyperbolic remark about the President was protected because it concerned governmental policy. Ms. Vaughn's tempered statement of sorrow and policy disagreement surely does.

Second, Ms. Vaughn's interest in First Amendment expression on gun deaths and gun policy outweighs Defendants' interest in the efficient operation of Defendant District, and Defendants cannot establish any material disruption. Defendants must establish that Ms. Vaughn's Facebook posts created a *material* disruption, not merely speculative "complaints" or even general allegations of "divisiveness." *Liverman*, 844 F.3d at 408; *McVey*, 157 F.3d at 279. Importantly, the courts recognize as "one of the most persistent and insidious threats to first amendment rights" as the "heckler's veto," where the government seeks "to curtail 'offensive speech at peril of suffering disruptions of public order.'" *Berger v. Battaglia*, 779 F.2 992 (4th Cir. 1985).

In *Liverman*, the Fourth Circuit found that while the defendant police department experienced some "budding 'divisiveness'" and some officers sought shift transfers to avoid working with the plaintiff officers, this generalized discomfort and potential for division was insufficient to overcome the officers' First Amendment protections. *Liverman*, 844 F.3d at 408-09, 410.

Similarly, in *Berger v. Battaglia*, the Fourth Circuit found that a police department's interest in maintaining order and harmony in its agency did not outweigh the First Amendment rights of an officer whose off-duty musical performance in blackface deeply offended many of his colleagues. *Berger*, 779 F.2d at 1001-02. While the court expressed "judicial sympathy" for the police department's dilemma "given the special circumstances of his public employment and the hard-earned and presumably still tenuous trust of the black community," it still maintained that the department could not subject the officer's conduct to a heckler's veto. *Id.*

Here, just as in *Liverman*, Defendants have not set forth any material disruption to its operations. There were no student incidents, no classroom interference, and no decline in Ms. Vaughn's performance. While some may have taken offense to Ms. Vaughn's post, which was, at bottom, a call for community safety and respect for all human lives, Defendants may not subject Ms. Vaughn to a heckler's veto or chill Ms. Vaughn's speech because it *may* be offensive to some. Ms. Vaughn sought to point out the inherent tragedy and irony of a man losing his life to the very policies he advocated for. While some may have found the timing or content distasteful, her post was a far cry from the racist blackface performance of an officer whose department had sought to gain the public's trust. Therefore, because Defendants have not set forth any evidence that

Ms. Vaughn's Facebook post caused any direct, *material* disruption to Ms. Vaughn's performance, relationships with colleagues, or classroom environment, she is likely to establish that Defendants cannot meet its burden under the *Pickering–Connick* test.

Because Ms. Vaughn's speech satisfies every element of the *Pickering–Connick* test and the District's policy mirrors those previously invalidated, she is overwhelmingly likely to succeed on both her as-applied and facial challenges.

## II. Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

It is well established that the loss of First Amendment freedoms, even for minimal periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Fourth Circuit has repeatedly reaffirmed that principle: "Violations of constitutional rights constitute *per se* irreparable injury." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

Here, Ms. Vaughn's termination inflicts continuing, compounding harm that cannot be undone by monetary damages alone. Each day she remains out of work under a cloud of unconstitutional discipline, she suffers:

- Professional harm, as her termination record stigmatizes her in the local education community, hindering her ability to obtain future employment;

- Reputational injury, because the basis for her firing—a mischaracterized "offensive" post—publicly brands her as unprofessional;

- Emotional and psychological harm, arising from the distress of being removed from a job she loved and excelled at, particularly in her home community; and

- Chilling effects on her own and others' speech, as District employees now understand that expressing lawful political opinions could result in termination.

Such harms are immediate and ongoing. They extend beyond lost income and affect intangible interests that no later award can redress. Courts consistently recognize that reinstatement is necessary to halt this type of continuing constitutional deprivation. *Newsom ex rel. Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (injunction proper to "protect against ongoing chill" to First Amendment rights).

Moreover, the District's continued enforcement of its Social Media Guidelines perpetuates a chilling environment across the workforce. Even employees uninvolved in this case are deterred from participating in public debate. That systemic chill is itself an irreparable institutional harm.

For these reasons, only injunctive relief—specifically, reinstatement and suspension of the unconstitutional policy—can prevent further violation and preserve Ms. Vaughn's and the public's constitutional interests pending final judgment.

### III.     The Balance of Equities Favors Plaintiff

The equities in this case weigh heavily in favor of Ms. Vaughn. On one side of the scale stands the ongoing deprivation of a fundamental constitutional right—the freedom of speech. On the other side is, at most, the District's administrative preference to maintain discipline under an unconstitutional policy. The law is clear: when the government's interest conflicts with an individual's First Amendment rights, the balance of equities almost always favors the speaker. *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011).

Ms. Vaughn has lost not only her livelihood, but also her professional standing in the community, for engaging in protected expression. She was terminated from a position she performed with distinction for six years, honored as River Ridge Elementary's Support

Staff Employee of the Year, and recognized by her supervisors for exemplary service. The harm to her personal dignity and professional reputation is profound and continuing. Courts consistently find that the loss of employment and reputation resulting from retaliation for protected speech constitutes substantial, irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).

By contrast, the District will suffer no legally cognizable injury if the Court grants relief. Reinstating Ms. Vaughn will not interfere with classroom instruction, budgeting, or student welfare. On the contrary, it will simply restore a capable educator to her post while this Court makes a final determination regarding the causes of action in this case. The District remains free to administer all lawful policies and to address any genuine workplace disruption if it arises—though none can be shown here.

The Fourth Circuit has emphasized that "there is no equitable interest in the enforcement of an unconstitutional law." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). The District therefore cannot claim harm from being required to comply with the Constitution. Indeed, any temporary administrative burden is minimal compared to the ongoing injury to Ms. Vaughn's constitutional rights and the chilling effect imposed upon other employees.

Finally, granting reinstatement promotes institutional fairness. It reassures other public employees that lawful political discourse will not result in punishment and demonstrates to the community that the school system honors, rather than suppresses, constitutional principles. The government's punitive action cannot outweigh the public's interest in open, honest debate. For these reasons, the balance of hardships and equities

tips overwhelmingly in favor of Ms. Vaughn, and the requested injunction will impose no undue burden on the Defendants.

### IV.     The Public Interest Favors Injunctive Relief

The public has a compelling interest in the preservation of constitutional rights—particularly the freedom of speech. The Fourth Circuit has made clear that "upholding constitutional rights serves the public interest almost by definition." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). When government actors suppress lawful expression, the injury extends beyond the individual speaker; it diminishes the civic discourse on which democratic government depends. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

This principle applies with special force in the public-school context. *Newsom ex rel. Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) recognizes that safeguarding constitutional expression in schools "serves the public's interest in protecting the marketplace of ideas for teachers and students alike." The public benefits when educators—those most directly engaged with civic education—may participate freely in debates on issues such as public safety, rights, and policy. Silencing that speech impoverishes students' own understanding of citizenship and erodes public trust in educational institutions.

Granting an injunction here would therefore affirm public confidence that constitutional protections apply equally to educators and administrators. The requested relief does not interfere with the District's educational mission; it simply bars the enforcement of a policy that punishes lawful expression. Restoring Ms. Vaughn to her

position and suspending the challenged policy will reinforce the principle that public employment is not conditioned on ideological conformity.

By contrast, denying relief would ratify an unconstitutional policy that chills discourse among hundreds of employees who now have reason to fear professional ruin for engaging in ordinary civic dialogue. The public interest is never served by continuing enforcement of an unconstitutional rule. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) ("The public interest is best served by preventing the continuing violation of the First Amendment.").

Because the injunction Ms. Vaughn seeks will vindicate fundamental constitutional values, promote transparency, and ensure that government employees may speak freely as citizens, the public interest weighs decisively in favor of immediate injunctive relief.

## **REQUESTED RELIEF**

Plaintiff respectfully requests that the Court:

1. Order her immediate reinstatement to her position as Teacher Assistant with pay and benefits pending final judgment;
2. Enjoin Defendants from enforcing or relying upon the Spartanburg District Five Social Media Guidelines as a basis for discipline or termination during this litigation; and
3. Grant such other and further relief as the Court deems just and proper.

(Signature Block on Following Page)

Respectfully submitted,

s/Jack E. Cohoon
_____
Jack E. Cohoon (Fed. ID No.9995)
Lydia Robins Hendrix (Fed. ID No. 14192)
BURNETTE SHUTT & McDANIEL, P.A.
912 Lady Street, Second Floor (29201)
Post Office Box 1929
Columbia, South Carolina 29202
Telephone: (803) 904-7914
Fax: (803) 904-7910
jcohoon@burnetteshutt.law
lhendrix@burnetteshutt.law

**ATTORNEYS FOR THE PLAINTIFF**

Columbia, South Carolina

October 15, 2025